**INTERNATIONAL BROTHERHOOD OF BOILERMAKERS, IRON SHIP BUILDERS, BLACKSMITHS, FORGERS AND HELPERS, AFL–CIO; Allan Stubna, as International Trustee of Local Lodge D31 of the Cement, Lime, Gypsum, and Allied Workers Division of the International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers, AFL–CIO.**

v.

**LOCAL LODGE D31 OF the CEMENT, LIME, GYPSUM AND ALLIED WORKERS DIVISION OF the INTERNATIONAL BROTHERHOOD OF BOILERMAKERS, IRON SHIP BUILDERS, BLACKSMITHS, FORGERS AND HELPERS, AFL–CIO, James E. Harris; William A. Sprague; J. Kenneth Black.**

Civ. No. PN–87–3442.

United States District Court,
D. Maryland.

Aug. 3, 1988.

Richard Zeff, Pfiefer and Fabian, Baltimore, Md., Michael J. Stapp, Blake & Uhlig, Kansas City, Kan., for plaintiffs.

Robert Rothstein, Meranze & Katz, Philadelphia, Pa., Victoria Hedian, Abato, Rubenstein & Abato, Lutherville, Md., for defendants.

## MEMORANDUM

NIEMEYER, District Judge.

Plaintiffs, International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers (hereafter the IBB) and Allan Stubna, the IBB appointed trustee for Local Lodge D31, commenced this action against Local Lodge D31 of the IBB, James E. Harris, William A. Sprague, and J. Kenneth Black, its officers, to enforce a trusteeship over Local Lodge D31 pursuant to Article XVIII, Section 1 of the IBB Constitution. An evidentiary hearing was held in open court on June 13, 1988 on plaintiffs' motion for a preliminary injunction to enforce the trusteeship. At the conclusion of the hearing the Court announced it would grant the motion to establish the trusteeship and directed that the defendants provide plaintiffs with copies of books and records of Local Lodge D31. The Court also froze existing bank accounts. After receiving a proposed order from counsel, the Court entered an order on August 1, 1988.

The reasons for that order are given herein.

### I

Plaintiff IBB is an international labor organization that represents employees throughout the United States for purposes of collective bargaining with, among others, the Lehigh Portland Cement Company. Plaintiff's headquarters and principal place of business are in Kansas City, Kansas. Plaintiff Allan Stubna is an employee of the IBB who was appointed by the IBB as the Trustee of Local Lodge D31. He joined as a plaintiff in his official capacity.

Defendant Local Lodge D31 is a certified local labor organization at the Lehigh Portland Cement Company facility in Union Bridge, Maryland. The Lehigh cement facility is one of eight Lehigh cement plants in the United States, the locals of which are

combined to form the Lehigh Joint Conference for purposes of bargaining with the Lehigh Portland Cement Company. Defendant James Harris is President of Local Lodge D31; defendant William Sprague is Recording Secretary; and defendant Kenneth Black is Financial Secretary. They have been sued in their official capacity.

Prior to 1984, Local Lodge D31 was affiliated with the Cement, Lime, Gypsum and Allied Workers International Union (hereafter the CWI). On April 1, 1984 the CWI merged with the IBB. Pursuant to the terms of the Merger Agreement and the amendments to the Constitution of the IBB which were agreed to, the Lehigh Joint Conference remained, but with the IBB instead of the CWI as bargaining agent. Under the merger agreement, joint officers were to be selected and the CWI was entitled to elect one international vice president. Each union member would pay a per capita tax in the amount of 1.65 times the base rate (as opposed to 1.0 paid by CWI members prior to the merger). The implementation of the agreements in electing officers was to take place at the bi-annual convention of the IBB in August, 1986.

Problems resulting from the merger first arose in August, 1986, at the IBB bi-annual convention. There was disagreement over who was eligible to vote for one of the vice presidents, and as a result the former president of the CWI was not elected to a vice presidency of the IBB. Following the convention, he and those who had supported him, formed a new union known as Independent Workers of North America (IWNA), which has sought to become the new bargaining agent for IBB local lodges that used to be local unions of the CWI.

After months of mounting dissatisfaction over the election procedures, which defendants characterize as undemocratic, officers and members of Local Lodge D31 resolved to disaffiliate from the IBB and to affiliate with the IWNA at a meeting on May 20, 1987. The 29 members present at the meeting signed a resolution to that effect, and the petition was then circulated to other workers at the plant for an additional 83 signatures, representing almost three-quarters of the membership of Local Lodge D31. There is no evidence that Local Lodge D31 ever advised the IBB of this vote.

Soon after the petition was signed, Local Lodge 31 began calling itself Local 31 IWNA (Local 31). It stopped paying the per capita tax to the IBB and opened a new checking account in the name of "Cement Workers Local 31." Monthly dues collected after May 1987 were deposited in this new account. None of the funds in the preexisting checking and savings accounts of Local Lodge D31 were transferred to the new account. However, monies in the original accounts of Local Lodge D31 were used to pay operating expenses of Local 31 after May 1987 and to pay dues to the AFL–CIO. (The IBB is affiliated with the AFL–CIO, but the IWNA is not.) Some monies from the original account were also spent in sending several members of Local 31 to a meeting with IWNA officials in Las Vegas in August 1987. The two accounts predating the opening of the new account in May 1987 are now exhausted, and all monies are held in the new account in the name of "Cement Workers Local 31." No payments have ever been made to the IWNA from any of the accounts.

Officers of Local 31 who testified at the preliminary injunction hearing said they believed that Local Lodge D31 had become Local 31 of the IWNA after the May 1987 meeting. While the IBB was never advised of this, James E. Harris, President of Local 31, did write Mr. Henry Brechtholdt, International Vice President of the IBB on July 14, 1987, notifying him that Local 31 would not be party to any agreement negotiated between the IBB and Lehigh Portland Cement Company, and any authority given to the IBB to negotiate was withdrawn. Harris sent a copy of the letter to officials of Lehigh Portland Cement Company. This may have been the first indication that the IBB had of the Local's intention to disaffiliate from the IBB and affiliate with the IWNA.

After unsuccessful attempts were made by representatives of the IBB to persuade Local 31 to reconsider its actions, IBB

President Charles Jones placed Local Lodge D31 under trusteeship, effective September 1, 1987, pursuant to Article XVIII of the IBB Constitution giving him authority to place a subordinate body in trusteeship in "emergency (situations) imminently threatening the welfare, funds, or property of the subordinate body." Allan Stubna was appointed trustee with full authority to manage and direct the affairs of Local Lodge D31. He promptly removed defendants Harris, Sprague, and Black from office and asked for the books, records, properties, funds and assets of Local Lodge D31 (which the officers refused to do up to the day of the court hearing). A hearing was scheduled to be held before the Executive Council of the IBB on September 15, 1987 to determine whether or not grounds existed for continuation of the trusteeship. In moving to establish a trusteeship, the IBB charged Local Lodge D31 with (1) promoting dual unionism, (2) pursuing disaffiliation, (3) failing to perform their duties, (4) failing to submit reports and per capita tax payments, and (5) possibly committing financial malpractice. Defendants elected not to attend the hearing on September 15, 1987, and the trusteeship was ratified, mainly on the basis that Local Lodge D31 failed to send in the per capita tax payments and misused treasury monies to finance discussions with the IWNA. IBB officials also assumed (incorrectly, as it turns out) that the Local was paying dues to the IWNA.

Notwithstanding the trusteeship, officers and members of Local 31 met again on October 12, 1987 to ratify their earlier decision of May 20, 1987 to disaffiliate. A secret ballot was taken, with a vote of 94 to 10 (with two votes discounted) in favor of disaffiliation. The IBB was not formally advised of this action.

Despite these moves to disaffiliate from the IBB, Local 31 filed an unfair labor practice charge with the NLRB against Lehigh Portland Cement Company in April 1988, denominating itself as an affiliate of the IBB. President Harris explained that he did this without consulting a lawyer and because the NLRB still recognized Local 31 as an affiliate of the IBB. He insists, however, that he and the other members of Local 31 think of themselves as belonging to the IWNA, even though the Local remains certified as a local of the IBB. He and other members of the Local admit to having engaged in some of the conduct cited by the IBB as justification for imposing a trusteeship, but they insist that the reasons given by the IBB for imposing the trusteeship are basically a pretext for the IBB's real purpose of preventing disaffiliation. Defendants do not challenge the procedures that were followed in imposing the trusteeship as improper procedures.

## II

■ At the outset, defendants argue that this Court is without jurisdiction to enforce the trusteeship since it is a matter that is properly within the jurisdiction of the NLRB. In making this jurisdictional argument, defendants characterize this case as one involving issues of representation (i.e. the choice of representatives to engage in collective bargaining with an employer on behalf of the employees). The National Labor Relations Act vests exclusive authority in the NLRB to pass on issues of representation. *NLRB v. Cabot Carbon Co.*, 360 U.S. 203, 79 S.Ct. 1015, 3 L.Ed.2d 1175 (1959). If an activity is arguably within the parameters of Section 7 or 8 of the Act, which accords employees the right to organize and bargain collectively through representatives of their own choosing and which makes it an unfair labor practice for a labor organization to restrain employees in the exercise of these rights, then federal courts may defer to the primary and exclusive competence and jurisdiction of the NLRB. *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 245, 79 S.Ct. 773, 779–80, 3 L.Ed.2d 775 (1959); *Garner v. Teamsters*, 346 U.S. 485, 74 S.Ct. 161, 98 L.Ed. 228 (1953); *Weber v. Anheuser–Busch, Inc.*, 348 U.S. 468, 75 S.Ct. 480, 99 L.Ed. 546 (1955).

There can be no doubt that the will of Local 31 is to become disaffiliated from the IBB and to become affiliated with the IWNA. And on the other side the IBB would like to prevent disaffiliation. These

issues are for the NLRB to decide pursuant to a Board certified election. That election may be in the offing in accordance with established procedures, but it has not yet taken place. The informal votes of members, as occurred here, will not effect a disaffiliation and cause an affiliation with another union.

At this point this is essentially a contractual matter between an international union and its local. See *Plumbers and Pipefitters v. Local 334*, 452 U.S. 615, 101 S.Ct. 2546, 69 L.Ed.2d 280 (1981). The dispute surrounds the issues whether the IBB may impose a trusteeship under the governing constitution and bylaws and in circumstances of this case. That such a contractual provision for a trusteeship is permissible is not challenged here. Title III of the Labor Management Reporting and Disclosure Act requires that trusteeships be established only in accordance with a constitution provision and only for certain purposes:

Trusteeship shall be established by a labor organization over a subordinate body only in accordance with the Constitution and By–Laws of the organization which has assumed trusteeship over the subordinate body and for the purpose of correcting corruption or financial malpractice, assuring the performance of collective bargaining agreements or other duties of a bargaining representative, restoring democratic procedures, or otherwise carrying out the legitimate objects of such labor organization. (29 U.S.C. § 462)

\*     \*     \*     \*     \*     \*

In any proceeding pursuant to this section a trusteeship established by a labor organization in conformity with the procedural requirements of its constitution and bylaws and authorized or ratified after a fair hearing either before the executive board or before such other body as may be provided in accordance with its constitution or bylaws shall be presumed valid for a period of eighteen months from the date of its establishment and shall not be subject to attack during such period except upon clear and convincing proof that the trusteeship was not established or maintained in good faith for a purpose allowable under § 462 of this title. After the expiration of eighteen months the trusteeship shall be presumed invalid in any proceeding and its discontinuance shall be decreed unless the labor organization shall show by clear and convincing proof that the continuation of the trusteeship is necessary for a purpose allowable under § 462 of this title, (29 U.S.C. § 464(c)).

Accordingly, as this is essentially a contractual matter, the Court will retain jurisdiction over the dispute.

### III

The circuit courts that have addressed the propriety of preliminary injunctions to enforce a trusteeship have generally not applied the traditional criteria for preliminary injunctions because of 29 U.S.C. § 464(c), which specifies the criteria for trusteeships and court enforcement of them. In keeping with the intent of Congress, a preliminary injunction is presumptively valid to impose a trusteeship so long as it was imposed in accordance with the union constitution, after a fair hearing, and for a proper purpose. *National Association of Letter Carriers v. Sombrotto*, 449 F.2d 915 (2d Cir.1971); *Jolley v. Gorman*, 428 F.2d 960 (5th Cir.1970); *Cascade Local Lodge 297 v. Machinists*, 111 L.R.R.M. (BNA) 3123 (D.Wash.1981), *aff'd.*, 684 F.2d 609 (9th Cir.1982). The *Sombrotto* court stated:

Ordinarily, a party seeking preliminary relief of this sort must carry the burden of showing a likelihood of success on the merits and a preponderance of harm running against him by denial of the application. But if this burden were rigidly imposed on a parent union seeking to enforce a trusteeship against one of its resisting locals, the local, by failing to comply with its obligation under the union constitution to accept a trusteeship lawfully imposed, could turn the statutory scheme for handling the trusteeship problem on its head.... Congress contemplated that if the parent's constitution had an appropriate provision and

this was complied with, the courts were to enter the picture to invalidate a trusteeship only if the local ... was able to overcome a rather stiff presumption of validity. ...Hence we believe that the parent is entitled to a preliminary injunction imposing a trusteeship on application unless the local comes forward with adequate proof that the trusteeship is not being sought in good faith. 449 F.2d at 920–21.

A similar conclusion was reached in *International Brotherhood of Boilermakers v. Local Lodge 714*, 663 F.Supp. 1071, 1075 (N.D.Ill.1987). These cases hold that in seeking an injunction the international need not show a likelihood of success on the merits, since 29 U.S.C. § 464 presumes the validity of a trusteeship imposed under a union constitutional provision after hearing unless the local is able to show by clear and convincing evidence that it was imposed for an improper purpose. See 29 U.S.C. § 464(c).

To meet its burden to obtain a preliminary injunction in court enforcing a trusteeship over a local union, the international therefore must show that: (1) the trusteeship was imposed in compliance with the union constitution and bylaws; (2) a fair hearing was held before the executive board of the union or other body specified in its constitution; and (3) the trusteeship was imposed for a proper purpose. *See International Brotherhood of Boilermakers v. Local Lodge D461*, 663 F.Supp. 1031, 1033 (M.D.Ga.1987); *Luggage Workers Union Local 167 v. International Leather Goods, Plastics and Novelties Workers' Union*, 316 F.Supp. 500 (D.Del.1970).

Local 31 does not challenge the procedural regularity in establishing the trusteeship in this case. Article XVIII of the IBB Constitution provides for the imposition of trusteeships, subject to a hearing within 15 days. In this case the trusteeship was imposed effective September 1, 1987 and a hearing was held, after proper notice, on September 15, 1987, at which time evidence was introduced to support the imposition of the trusteeship. Defendants were afforded the opportunity to contest that evidence, cross-examine witnesses, and present their own testimony. However, they chose not to attend the hearing.

Since the first two of the three requirements for the injunction leaves open only the third, which carries the statutory presumption of validity, defendants must in this case show by clear and convincing proof that the trusteeship was not established or maintained in good faith for a purpose allowed by 29 U.S.C. § 462, a burden they have not met.

■ The grounds specified in Article XVIII, Section 1 of the IBB Constitution for imposing a trusteeship are as follows:

Grounds for the imposition of trusteeships shall include: secession or threatened secession; dissolution or threatened dissolution; dissipation or loss of funds or assets or financial malpractice or corruption or threat thereof; violation or threatened violation of collective bargaining agreements; the deprivation of democratic procedures and other activities constituting a violation of this Constitution and threatening the welfare of the subordinate body membership or the International Brotherhood.

These enumerated grounds track the lawful purposes of a trusteeship as outlined in the Title III of the Labor–Management Reporting and Disclosure Act, 29 U.S.C. § 462. International President Charles Jones advised Local Lodge D31 that the trusteeship was being imposed in this case for specific violations along these same lines. He accused them of (1) dual unionism, (2) promoting disaffiliation, secession and dissolution of Local Lodge D31, (3) failure to perform their duties in accordance with the IBB Constitution, (4) possible financial malpractice, misappropriation, dissipation, and improper use of funds and assets of Local Lodge D31, and (5) failure to submit reports and pay per capita tax payments.

In view of the evidence the Court concludes that the IBB had a proper purpose to impose a trusteeship. It remains unchallenged that the officers of Local Lodge D31 had not sent quarterly reports or per capita tax payments to the IBB since May

1987. Some of the officers and members of Local Lodge D31 were known to have travelled to Las Vegas in early August to meet with IWNA officials who were urging the local to disaffiliate from the IBB and join the IWNA, and Local Lodge D31 treasury funds were expended to finance these trips. Local 31 did offer evidence of a short meeting at that convention in Las Vegas involving the Lehigh Joint Conference, which alone may have been a legitimate purpose for the expenditure of such funds. But that meeting was at best perfunctory, lasting a few hours and involving only three of the eight locals who were members. The primary purpose of the trip was to meet with the IWNA group. Moreover, the Local 31 President had told the Lehigh Portland Cement Company that Local Lodge D31 no longer considered the IBB to be conducting negotiations on its behalf. Since there had been no collective bargaining agreement in effect for several years and the IBB had been the designated agent to negotiate a new agreement with company officials, this had a significant effect on IBB standing in those negotiations. Finally, defendants' admission at the preliminary injunction hearing that the funds in the treasury of Local Lodge D31 were exhausted in the manner described is a significant justification to enforce the imposition of a trusteeship. While IBB did not perhaps know of the status of the various Local's accounts, it correctly suspected financial mismanagement.

■ Similar actions of other Locals have been sufficient to justify the imposition of a trusteeship in other cases. *Sombrotto, supra,* at 923; *C.A.P.E. Local Union 1983, IBPAT, AFL–CIO, of Cape May County, N.J. v. International Brotherhood of Painters and Allied Trades,* 598 F.Supp. 1056, 1075 (D.N.J.1984); *International Brotherhood of Electrical Workers Local 1186 v. Eli,* 307 F.Supp. 495, 506 (D.Hawaii 1969). Some courts have held that a Local's attempt to disaffiliate is enough, by itself, to justify the imposition of a trusteeship where the disaffiliation would have a detrimental impact upon collective bargaining. *Executive Board Local 1302 v. United Brotherhood of Carpenters and Join-*

*ers of America,* 477 F.2d 612, 613 (2d Cir. 1973); *Sombrotto, supra,* at 923; *McVicker v. International Union of District 50, Allied and Technical Workers of the United States and Canada,* 327 F.Supp. 296, 301 (N.D.Ohio 1971). Even those courts that have indicated that attempted disaffiliation alone is not sufficient grounds for a trusteeship have found that the threat of imminent disaffiliation combined with other violations does suffice to justify the imposition of a trusteeship. *C.A.P.E. Local Union 1983,* supra at 1069.

The defendants claim that the main purpose for the trusteeship was IBB's hope that the imposition of a trusteeship would help to block the disaffiliation of Local 31. Defendants cite a number of cases where the courts have struck down a trusteeship because the local union essentially sought to disaffiliate from the parent union. *Benda v. Grand Lodge of the International Association of Machinists and Aerospace Workers,* 584 F.2d 308 (9th Cir.1978); *Local Union 13410, United Mine Workers of America v. United Mine Workers of America,* 475 F.2d 906 (D.C.Cir.1973); *United Brotherhood of Carpenters and Joiners of America v. Brown,* 343 F.2d 872 (10th Cir.1965). That right is a carefully protected right of every local labor organization, and it is clear that a parent organization's desire to control dissident locals is not a proper excuse for a trusteeship.

Mere assertion of bad faith, however, will not overcome the presumption created by the evidence in this case that the trusteeship was imposed for a permissible purpose under the law. *Lucas v. Electrical Workers,* 106 L.R.R.M. (BNA) 3035 (D.Ariz.1979). Had Local Lodge D31 simply been meeting to discuss or to make plans to disaffiliate from the IBB, there would be no basis for a trusteeship. However, Local Lodge officers went so far as to notify improperly Lehigh Portland Cement Company that it was withdrawing consent to future negotiations by the IBB on behalf of Local Lodge D31. This could be expected to have the effect of undermining the collective bargaining position of the IBB. Local 31's further actions in spending Local

Lodge D31 treasury funds on trips to Las Vegas for discussions with rival union officials, by opening a new bank account with the ostensible purpose of keeping funds from the IBB, and by withholding per capita tax payments and accounting reports from the International provide sound grounds for a trusteeship.

Accordingly, the Court will enter a preliminary injunction enforcing the trusteeship. During the time of the trusteeship, plaintiff Allan Stubna will act as trustee of the affairs of Local Lodge D31. In order to permit Trustee Stubna to perform his duties, defendants Harris, Sprague, and Black will be directed to turn over the books, papers, records, and assets of Local Lodge D31 to the trustee. However, Trustee Stubna will be ordered not to expend any monies from the accounts of Local Lodge 31 except pursuant to application and Court order.

The Court does not reach at this time the issue of who under the Merger Agreement or the amendments to the Constitution of the IBB controls the ownership of the assets of the Local Lodge D31 or Local 31 in the event of disaffiliation or dissolution of the Local.